IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WILLIAM A. SHLAPACK          *
                             *
          v.                 *          Civil No. JFM-01-CV-3781
                             *
UNUM LIFE INSURANCE CO.      *
     OF AMERICA              *
                          *****

MEMORANDUM

Plaintiff William A. Shlapack has filed suit under the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. He challenges the amount of long-

term disability benefits he is receiving from the defendant, Unum Life Insurance Co. of America.

Shlapack contends that the benefits are not based on the correct figure for his basic monthly

earnings prior to becoming disabled, and thus are lower than they should be. Both parties have

moved for summary judgment. For the reasons set forth below, defendant's motion will be

granted, and plaintiff's motion will be denied.

I.

Shlapack was hired as an account executive at Western Digital Corp. in 1990. (R. 596.[1])

His job involved selling and demonstrating computer equipment in the mid-Atlantic region. (R.

809.) At the end of 1999, he transferred to Western Digital's new Connex business unit. (R.

592-93.) Within several months of this transfer, Shlapack began suffering various cardiac

symptoms, including atrial fibrillation, dizziness, weakness, fainting, and shortness of breath.

---

[1]The 851-page administrative record is attached to Defendant's Memorandum as Exhibit
1. Documents in the record will be referenced by Bates number.

1

(R. 809.) As a result, he stopped working in May 2000 and applied for disability benefits from Unum, the administrator and insurer of Western Digital's disability insurance plans. (Id.)

Unum approved Shlapack's request for short-term disability benefits in June 2000. (R. 841.) After paying benefits from May 12, 2000, to August 9, 2000, the 90-day maximum benefit period under the short-term disability policy, Unum transferred Shlapack's file to its long-term disability unit for evaluation. (R. 801.) In September 2000, Unum denied Shlapack's request for long-term disability benefits on the ground that he was not disabled under the terms of the policy. (R. 465, 469-70.) However, it reversed its decision in November 2000, after considering additional medical information that Shlapack submitted. (R. 312-14.) It then paid Shlapack long-term disability benefits retroactive to August 10, 2000, the day after his short-term benefits expired. (R. 312.)

The dispute in this case centers on how Unum calculated the amount of long-term disability benefits Shlapack received. According to Western Digital's policy, Shlapack was entitled to long-term disability benefits equal to 60 percent of his "basic monthly earnings" prior to becoming disabled, up to a maximum monthly benefit of $15,000. (R. 143, 855.) The policy defines "Basic Monthly Earnings" (BME) for sales employees as:

> . . . the insured's monthly rate of earnings, including draw income, from the employer in effect just prior to the date disability begins. It includes pre-tax contributions to a cafeteria plan as defined in Section 125 [of] the Internal Revenue Code for that calendar year, and to a deferred compensation plan which is defined by a documented predetermined formula. It does not include commissions, bonuses, overtime pay and other extra compensation.

(R. 132.) Unum considered only Shlapack's $70,000 base salary in determining his BME. (R. 229.) It found he did not receive any draw income prior to May 12, 2000, which it determined

2

was the date Shlapack had become disabled.[2]  (Id.)  Therefore, Unum concluded, Shlapack earned $5,833.32 per month prior to his disability, entitling him to 60 percent of this amount – $3,500 – in monthly benefits.  (R. 198.)

Shlapack objected, first, to Unum's determination of his date of disability.  Shlapack's date of disability is relevant to the determination of whether he received "draw income" under the policy, since Connex apparently began a "sales draw program" on May 15, 2000, three days after Shlapack's disability leave began.  In a letter dated November 16, 2000, Shlapack asked Unum to change his file to indicate a date of disability of May 29, 2000.  (R. 290.)  In support of his request, he submitted a paycheck stub from Connex for the pay period May 15, 2000, to May 28, 2000, which indicates that he received 80 hours of "regular pay" for those two weeks.  (R. 291.)

On January 24, 2001, Unum affirmed its decision as to Shlapack's disability date.  (R. 228-30.)  It noted that Shlapack had indicated on his application for disability benefits that he had been disabled since May 12, 2000, and that his employer's statement listed May 11, 2000, as his last day of work.  (R. 229.)  Unum also stated that Shlapack had told his employer on May 19, 2000, that he had been disabled since May 12, 2000.  (Id.)  It contended that the payroll check for May 15 to 28 had been issued in error.  (Id.)

Shlapack, through counsel, then objected that, regardless of which date of disability was correct, his BME should have been higher.  (R. 212.)  In a March 8, 2001, letter to Unum, Shlapack's counsel asserted that Shlapack had earned $110,000 a year prior to his disability, of which $70,000 represented base salary and $40,000 "annual draw pay income . . . ."  (Id.)  Thus,

---

[2]Shlapack does not contend that Unum failed to include in his BME pre-tax contributions to cafeteria plans or deferred compensation plans, as defined by the policy.

3

the letter argued, Shlapack's pre-disability BME was $9,166.67. (Id.) This would entitle
Shlapack to approximately $5,500 in monthly long-term disability benefits – $2,000 more per
month than Unum had been providing.

Unum treated the dispute as an appeal, and referred the matter to its "CPA Team." (R.
198-99, 209.) Vicki Riggs, a certified public accountant, concluded that the $40,000 "draw pay
income" that Shlapack claimed actually was a sales incentive, which would be categorized as
either a "commission" or "bonus" under the terms of the policy and excluded from BME. (R.
198.) Riggs also investigated the pay stub for May 15 to May 28. She found that it included a
"draw" of $2,171.05 – the first such "draw" payment of 2000. (Id.) However, she agreed with
Unum's earlier conclusions that Western Digital had erroneously issued this paycheck to
Shlapack, describing the pay as akin to "sick pay or salary continuation." (Id.) She further
determined that because this paycheck was issued after Shlapack's May 12 date of disability, the
"draw" it included did not constitute "pre-disability earnings." (Id.) Accordingly, Unum denied
Shlapack's appeal on May 30, 2001. (R. 167-68.) At the same time, however, it also referred the
matter to its "Quality Performance Support Unit" for further consideration. (R. 168.)

On August 22, 2001, a senior appeals specialist for Unum issued a final decision denying
Shlapack's appeal. This letter reiterated that the $40,000 cited by Shlapack's counsel was a sales
commission, and thus appropriately excluded from BME. (R. 111.) It stated that this had been
confirmed by Connex, Shlapack's employer. (Id.) Unum also contended that Shlapack was not
eligible for any draw pay because his employer's draw program began on May 15, 2000, after he
took disability leave. (Id.)

Shlapack sought review of Unum's decision in the Circuit Court for Baltimore City.
Unum removed to this court. Shlapack then amended his complaint to make clear that his claim
arises pursuant to an ERISA provision that allows a plan beneficiary to sue "to recover benefits
due to him under the terms of his plan . . . ." 29 U.S.C. § 1132(a)(1)(B). He seeks more than
$30,000 in back benefits and a court order requiring Unum to pay him benefits of $5,500 per
month while his disability continues. (Am. Compl. ¶ 20A-B.)

## II.

### A.

The threshold question is what standard of review the court should apply to defendant's
benefit determination. Plaintiff contends that the decision should be reviewed <u>de novo,</u> or at
least under the modified abuse of discretion standard appropriate when a plan administrator
operates under a conflict of interest. Defendant argues that abuse of discretion is the appropriate
standard because of the grant of discretionary power given to the plan administrator by the
policy. I conclude, albeit for a different reason than is suggested by the plaintiff, that <u>de novo</u>
review is appropriate.

The key to determining the standard of review to be applied in an ERISA case is the
language of the policy or plan under which the challenged decision was made. As the Fourth
Circuit has explained: "When . . . a plan by its terms confers discretion on a fiduciary and the
fiduciary acts within the scope of conferred discretion, we defer to the fiduciary in accordance
with well-settled principles of trust law . . . ." <u>Booth v. Wal-Mart Stores, Inc. Assocs. Health &</u>
<u>Welfare Plan,</u> 201 F.3d 335, 341 (4th Cir. 2000) (citing <u>Firestone Tire & Rubber Co. v. Bruch,</u>
489 U.S. 101, 111 (1989)). By contrast, if the plan does not grant deference to the plan

administrator, or if the administrator's decision falls outside the scope of the discretion conferred

by the plan, review is de novo. See Haley v. Paul Revere Life Ins. Co., 77 F.3d 84, 89 (4th Cir.

1996).

Defendant's argument that its decision is entitled to review under an abuse of discretion

standard is based entirely on the following language, which appears not in Western Digital's

Group Long Term Disability Insurance Policy, but in the Summary Plan Description (SPD) for

that policy:[3]

> In exercising its discreationary [sic] powers under the Plan, the Plan
> Administrator, and any designee (which shall include the insurance company as a
> claims fiduciary) will have the broadest discretion permissible under ERISA and
> any other applicable laws, and its decisions will constitute final review of your
> claim by the Plan.  Benefits under this Plan will be paid only if the Plan
> Administrator, or its designee (including the insurance company), decides in its
> discretion that the applicant is entitled to them.

(R. 855.)  The SPD also states that if its terms differ from those of the policy, "the policy will

govern."  (R. 854.)  The policy itself does not contain any language conferring discretion on the

plan administrator, and defendant has not suggested any of the policy language could be so

construed.

A similar situation was presented in Glocker v. W.R. Grace & Co., 974 F.2d 540 (4th Cir.

1992).  Like this case, Glocker involved an SPD that contained discretionary language, a policy

that did not, and a provision in the SPD that "represent[ed] that the Plan controls" over the SPD.

Id. at 542-43.  The Fourth Circuit held that "[i]n view of [the] disclaimer" in the SPD that the

_____

[3]Although defendant repeatedly states that this language appears in the "plan" itself
(Def.'s Mem. at 2, 5, 7; Def.'s Opp'n to Pl.'s Mot. at 3-4), a supplemental affidavit filed in
support of defendant's motion for summary judgment clarifies that the language actually appears
in the SPD and not in the policy.  (See Cozzo Aff. ¶ 4.)

plan controls, the defendant could not rely on the discretionary language in the SPD when the plan itself lacked such language. Id. at 543  Because "the Plan does not confer on . . . the administrator of the Plan[] discretionary authority with respect to eligibility for benefits or the interpretation of the Plan," the court held, "the district court should have reviewed the denial of benefits de novo." Id. Glocker thus is directly on point to this case, and mandates de novo review of defendant's benefits decision.[4]

B.

Even though I grant no deference to defendant's decision as to the amount of benefits plaintiff should receive, I find that, based on the evidence in the record,[5] no reasonable jury could conclude that plaintiff is entitled to prevail on his claim.  The evidence supports but one conclusion: plaintiff's BME prior to his disability was $5,833.32 based on his annual salary of $70,000 per year.  Thus, defendant accurately calculated plaintiff's long-term disability benefits.

---

[4]Because I conclude that de novo review applies, I do not address plaintiff's argument that the discretion granted to defendant should be reduced to account for its conflict of interest or alleged inconsistencies between defendant's decision-making process and ERISA's procedural requirements.  Although plaintiff discusses ERISA procedures, he does so in the context of a reasonableness inquiry under the deferential standard of review. (See Pl.'s Mem. at 15-16.) I do not understand plaintiff to be attempting to make a separate claim purely for alleged procedural violations of ERISA.

[5]The parties dispute whether I am limited to the administrative record that defendant compiled in reaching its decision or whether I also may consider extrinsic evidence submitted by plaintiff in support of his motion.  In Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017 (4th Cir. 1993), the Fourth Circuit held that a district court conducting a de novo review in an ERISA case should rely upon "only the evidentiary record that was presented to the plan administrator," unless there are "[e]xceptional circumstances" warranting a broader review. Id. at 1026-27. One such circumstance set forth by the court is present here, which is that "the payor and the administrator are the same entity and the court is concerned about impartiality . . . ." Id. at 1027. I thus will consider the evidence submitted by plaintiff, in addition to that submitted by defendant.

Although plaintiff argues that his basic monthly earnings were in fact $110,000, there is no evidence, other than his own unsworn assertions, that the $40,000 he describes as "draw pay" (Pl.'s Mem. Exs. 2, 3) was in fact "draw income" under the long-term disability policy. Rather, plaintiff's employer, Connex, made clear that the $40,000 was a bonus or other "extra compensation," which the policy expressly excludes from BME. (R. 50.)

Connex outlined the terms of plaintiff's compensation in a December 13, 1999, offer letter that plaintiff signed. (R. 593.) The letter states that plaintiff would earn an "annualized base salary of $70,000" and would be "eligible for a sales <u>bonus</u>/incentive program with a <u>bonus</u> capability up to $40,000 per year beginning in January, 2000." (<u>Id.</u>) (emphasis added).[6] The bonus was to be paid in quarterly installments. (<u>Id.</u>)[7] Similarly, a Western Digital Employee Status report dated December 16, 1999, indicated that plaintiff's "proposed salary rate" in the new position was $70,000 per year, and an "Authorization to Hire" form described plaintiff's transfer to a position with an annual salary of $70,000 and "Bonus capability to $40K." (R. 591, 594.)

Plaintiff's paychecks confirm the nature of the $10,000 payments as extra compensation that should not have been included in BME. When Connex paid plaintiff quarterly installments

---

[6]Wendy Von Bronkhorst, a Connex payroll official, reported to defendant that the Sales Incentive was a "commission . . . ." (R. 121.) As either a commission or a bonus, the sales incentive was not part of plaintiff's BME under the terms of the policy.

[7]Just because the $40,000 bonus was paid in installments does not transform it into "draw income" under the policy. It would be nonsensical if the periodic nature of a payment alone made it part of BME, when the payment itself was of a type specifically excluded from BME by the policy – such as, in this case, a bonus or "extra compensation" that was not guaranteed under the employee's basic terms of employment.

of this $40,000 bonus, it described the compensation on plaintiff's paychecks as a "Sales

Incentive" and segregated it from plaintiff's "Regular Pay." (Def.'s Mem. Exs. 3, 4.) Further,

the fact that the bonus was not considered a "draw" is evidenced by the fact that Connex had a

separate compensation category called "Draw on Commission." (See Def.'s Mem. Ex. 4.)

Connex did not pay plaintiff any draws on commission in the year 2000 until the paycheck of

May 15, 2000, to May 28, 2000 (see id.), which all the evidence indicates did not constitute pre-

disability earnings of the plaintiff.[8]

    Plaintiff offers scant evidence in support of his assertion that the $40,000 he claims he

received in addition to his base salary of $70,000 was part of his "basic monthly earnings" for

purposes of disability benefits. In fact, he relies chiefly upon his own characterization of the

$40,000 as a "sales draw," "draw pay," or "draw" in several electronic mail messages and letters.

(See Pl.'s Mem. Exs. 2, 3, 13.) This is not proof that the $40,000 should have been considered

part of BME under the terms of the policy, however. Further, plaintiff himself acknowledged

---

[8]The evidence overwhelmingly supports the conclusion that plaintiff did not work at
Connex during this two-week period, despite the fact that he received a paycheck that included
this "draw." First, plaintiff himself stated on his application for disability benefits that he was
disabled as of May 12, 2000, prior to the date of the check. (R. 809.) Second, although plaintiff
later sought to characterize this date as an error attributable to his employer (see Pl.'s Mem. Ex.
10) and to contend that he was not disabled until May 29, 2000, he continued to rely upon the
earlier disability date in seeking Social Security benefits. (R. 205.) In a February 23, 2001, letter
to the Social Security Administration, he stated: " . . . I have been unable to work since May 11,
1999 when my employer placed me on full time disability leave." (Id.) Third, plaintiff informed
Western Digital that May 12 was his date of disability for purposes of the Family and Medical
Leave Act. (See Pl.'s Mem. Ex. 6.) In light of this evidence, and the evidence from Connex that
plaintiff had been paid in error for the May 15 to May 28 period, no reasonable juror could find
that plaintiff's pre-disability earnings included this "draw" received from his employer after May
12, 2000. I thus need not decide whether this $2,171.05 "Draw on Commission" should have
been classified as "draw income" or "commission" for purposes of the long-term disability
policy.

that the $40,000 was not part of his "regular salary." (Id. Ex. 3.) In an April 28, 2000, email, he requested his "first quarter draw pay of $10,000" and then stated, "[J]ust getting paid my regular salary is not enough for me to meet my financial commitments." (Id.)

Plaintiff also seeks to rely for support on the fact that defendant had paid him higher short-term disability benefits under a Western Digital policy that contained a similar definition of "basic" earnings to that contained in the long-term disability policy at issue here.[9] It appears that defendant did initially pay plaintiff short-term disability benefits based on an annual income of $70,000, but then increased plaintiff's benefits after receiving documentation from a Western Digital nurse who indicated that plaintiff earned approximately $110,000 per year. (See Pl.'s Mem. Exs. 13, 14.)

Despite defendant's change in short-term disability benefits, there is no evidence to indicate that defendant altered its substantive view of what constituted BME as opposed to simply accepting the nurse's documentation and paying plaintiff what he contended he was owed. Even if plaintiff could produce such evidence, I would not conclude that defendant's decision as to short-term benefits would bind it as to the amount of long-term benefits it must pay. Defendant specifically cautioned plaintiff that short-term disability coverage differed from long-term disability coverage and was governed by different plans. (R. 801.) Further, the two types of coverage involve significantly different financial considerations, and thus it is not surprising that long-term disability claims would be more closely scrutinized than short-term

---

[9] Western Digital's short-term disability plan defines "basic weekly earnings" for sales employees as "the amount of regular weekly pay plus draw salary paid by your employer." (Pl.'s Mem. Ex. 8 at 3.) It excludes "commissions, bonuses, overtime, incentive pay or any other extra compensation." (Id.)

ones. In the case of Western Digital's policies, short-term benefits are paid only for a maximum of 90 days, whereas long-term benefits may be paid to a beneficiary for years.[10] Closer scrutiny of long-term benefits, without more, is not indicative of a failure by the plan administrator to act impartially, nor does it suggest the earlier short-term benefit amount was necessarily correct. Rather, such scrutiny is merely part of the administrator's duty to "preserv[e] . . . funds for those who satisfy" plan requirements. Ellis v. Metro. Life Ins. Co., 126 F.3d 228, 234 (4th Cir. 1997).

In conclusion, a de novo review of the evidence in this case supports defendant's decision that only plaintiff's regular salary of $70,000 a year should have been included in his basic monthly earnings for the purposes of determining the amount of long-term disability benefits he was eligible to receive under the policy. Therefore, defendant is entitled to summary judgment.

Date: _September 3, 2002_

J. Frederick Motz
United States District Judge

---

[10]In plaintiff's case, since he applied for disability at age 50, he could theoretically receive long-term disability benefits for 15 years, until he reaches age 65. (R. 50.)

11